IRVING, P.J.,
dissenting:
¶ 38. The majority finds that the Department terminated Ray’s employment for conduct other than that for which he was charged and, therefore, violated his due-process rights. More specifically, the majority finds that neither the hearing officer nor the full EAB or the circuit court found that Ray falsified any of the tickets he issued for Patterson, Ulmer, Thomas, or Carpenter. In my opinion, the majority’s finding — that neither the hearing officer nor the full EAB found that Ray falsified any of the tickets he issued for Patterson, Ulmer, Thomas, or Carpenter — represents an unjustified and excessively narrow reading of the orders of the hearing officer and the full EAB that is not supported by the record. It is clear to me that both the hearing officer and the full EAB found that Ray wrote twenty to twenty-five fraudulent tickets that included the fraudulent tickets that he wrote for Patterson, Ulmer, Thomas, and Carpenter. Therefore, I dissent. I would affirm the judgment of the Circuit Court of Hinds County, which affirmed the order of the full EAB, terminating Ray’s employment.
1139. It is important to establish what Ray was charged with. To do so, I quote verbatim from the statement of charges filed by Captain Richard Watkins, Commander Troop J of the Southern Enforcement District:
TFC Sammy Ray, a sworn officer, did violate DPS [ (Department of Public Safety) ] General Order 23/01, III. B. 2., a. (Group Two Offense) in view of General Order 05/02 and B. 3., d., (Group Three Offense), to wit:
a. insubordination, including but not limited to resisting management directives through actions and/or verbal exchange, and/or failure to follow supervisor’s instructions, perform assigned work, or otherwise comply with applicable established written policy;
and,
*210 d. falsification of records, such as, but not limited to, vouchers, reports, time records, leave records, employment applications, or other official state documents.[14]
FACTS
On September 21, 2009[,] the Internal Affairs Division of the MHP was advised to conduct an investigation regarding an allegation of conduct on TFC Sammy Ray. The allegation was that TFC Ray may have been falsifying state documents on his Ticket Control Sheets.
(Group Three Offense — Four Counts— Falsification of Records)
Through investigation into the allegations against Ray it was discovered that on four (4) separate occasions he had written false tickets, otherwise known as “ghost tickets” on people that he had encountered on the road. Ray would issue a citation to an individual and obtain the personal information. He may issue a lone citation and then with the individual’s personnel information write an additional charge that would be entered on his ticket control sheet to make it appear as though he was writing more tickets than he actually was at the time. In doing so, Ray was falsifying official state documents, which is a Group Three Offense. He did this on four (4) occasions resulting in four (4) separate Group Three charges for falsification of records.
(Group Two Offense — One Count — Insubordination)
During the course of the investigation into allegations of falsifying documents against Ray it was discovered that on August 8, 2009, TFC Ray was dispatched to a wreck on Interstate 59. Ray was not wearing his Class A uniform. Instead, Ray was wearing a MHP t-shirt, MHP hat, shorts and sandals. While investigating the accident, Ray made an arrest for DUI and transported the individual to the Jones County Detention Center. This is a direct violation of General Order 05/02 which in turn makes Ray guilty of insubordination, which is a Group Two Offense.
Based upon the above, it is evident that the actions alleged herein are in violation of departmental rules and regulations, being DPS General Order 23/01, III, B. 3., d. (Group Three Offense— Four Counts), and B. 2., a. (Group Two Offense — One Count). Therefore, it is my belief that TFC Sammy Ray, J-23, a sworn officer of the Mississippi Highway Safety Patrol, should be subjected to a Performance Review Board Hearing pursuant to the provisions of DPS General, Order -24/05, with the allegations contained herein heard as One Group Two Offense and Four Group Three Offenses therein.
¶ 40. As noted, Ray was charged with falsification of records, or other official state documents. Therefore, it is critical that there be a clear understanding of exactly what Ray did and how the Department classifies that action. The charging statement did not set forth the specifics of the falsification. The specifics were derived from the witnesses who testified on behalf of the Department, the first of whom being Lieutenant Colonel Don L. Berry.
¶ 41. Prior to Lieutenant Colonel Berry’s testimony, counsel for the Department explained that the charge of falsification of records involved writing false tickets and that in the vernacular of the Highway Patrol, those are called “ghost tickets.” *211 He further explained what the Department considers a false or ghost ticket:
Basically what happens and what has happened in this case as well as past cases is the law enforcement officer will pull somebody over for a lawful purpose, such as speeding. At that point, [the officer] get[s] the individual’s driver’s information, their driver’s license number, name, address, the information used on a ticket. [The officer] may write that person [a ticket] for the actual infraction. ... At that point, the ... trooper would write additional tickets such as seat belt violation or such as inspection sticker violation that did not take place.... The officer would then place these tickets, these fraudulent tickets[,] in addition to the actual ticket on [his][t]icket [c]ontrol [s]heet. The [ticket [c]ontrol [s]heet is, in a lot of ways, a reference as to how many tickets the [t]rooper is writing. The [t]rooper know[s] that these tickets do not make it to the Justice Court or through [the] in-process [at] the Justice Court. [The trooper] will then void [the] tickets that are fraudulent tickets. • When [the] trooper’s [supervisor] looks at the ticket control sheet, it makes it appear as though [the trooper] is writing more tickets than he is.
¶ 42. Lieutenant Colonel Berry testified that he was Deputy Director of the Uniform Division of the Highway Patrol and that he had been employed with the Mississippi Highway Patrol a little over thirty years. He testified that writing a fraudulent ticket is a group-three offense, the most severe offense, and that one group-three offense could lead to termination. He affirmed that it was not normal practice for officers to get the personal information of a motorist and write a ticket for offenses that did not occur.
¶43. The next witness to testify was Master Sergeant Creede Mansell. Sergeant Mansell confirmed that Ray was charged with writing fraudulent tickets to only four individuals: Patterson, Thomas, Ulmer, and Carpenter. Sergeant Mansell identified a statement given by Patterson, which recited what occurred when she was pulled over by Ray. In the statement, Patterson said that she was wearing her seat belt when she was pulled over for speeding. She admitted to Ray that she had been speeding and apologized. Patterson said that Ray took her driver’s license and returned a short time later. Ray did not give Patterson a ticket for anything but told her to slow down. However, Trooper Ray turned in two tickets written for Patterson, one for speeding and one for not wearing a seat belt. Neither ticket had the word “warning” written on it.
¶ 44. Sergeant Mansell also testified regarding the tickets that Ray issued to Thomas, Ulmer, and Carpenter. As to Thomas, Ray issued tickets for an expired inspection sticker, speeding, and á seat belt violation. Thomas gave a statement to Sergeant Mansell wherein he stated that he did not remember ever getting the speeding or expired-inspection-sticker ticket and that he was sure he never received a ticket for a seat belt violation.
¶ 45. According to Sergeant Mansell, Ray wrote two tickets for Ulmer: one for speeding and one for a seat belt violation. However, Ulmer gave a statement to' Sergeant Mansell wherein he stated that Ray gave him a ticket for the seat belt violation but did not give him one for speeding and never mentioned anything about speeding to him.
¶ 46. Finally, Sergeant Mansell testified about the tickets that Ray issued to Carpenter. Mansell stated that Ray wrote two tickets for Carpenter: one for an ex *212 pired inspection sticker and one for a seat belt violation. Carpenter gave a statement affirming that Ray gave her a ticket for an expired inspection sticker. However, she stated that Ray did not give her a ticket for the seat belt violation.
¶ 47. Ray gave four statements: two in his handwriting and two in the form of a question-and-answer interview. In the first one, given on October 26, 2009, in interview form to Sergeant Mansell, Ray stated the following:
Q. Okay. Earlier we went over some of these citations, [Ray], where you had made traffic stops on individuals and then voided all tickets out and some of these actual citations were in fact true stops, is that correct?
A. Yes.
Q. Okay, and then on some of the— some of the particular stops there may have been instances where there was a good violation, such as speeding or careless driving, something to that nature, and — and then a seat belt violation would follow. In some of these situations, were the actual seat belt violations good violations or were they just tickets that were — that you marked seat belt violations on there just — just to — just to mark it, is that kind of what you told me earlier?
A. Yes.
Q. Okay, and on how many situations ■ ■ would you say that occurred? That, you know that you can recall or— before you answer that, is it something that you did a couple of times, several times, or just throughout the course of each work schedule?
A. Several times.
Q. Okay. And if you had to put a number on it how many would you say?
A. I don’t know a percentage or a number.
Q. Well, let me ask you this, would you — would it be something that you would do, if you — how many tickets do you write a month?
A. 70-75.
Q. About 70 tickets, okay, so that’s probably anywhere from 25 stops to 30 stops?
A. Yeah.
Q. Maybe. Out of those 30 stops in a month how many times would you say that it occurs?
A. I don’t know. Maybe three or four, I guess. I don’t know.
Q. So, three or four — three or four times a month, so that would be— would that be like every month?
A. I guess 20 to 25 times a month, to put a number on it. I don’t know.
Q. Okay. So, and just — just to make sure that what we are talking about it — you make a — you make a good actual stop for say speeding and the individual has their seat belt on and you just write a no[-]seat belt violation and void it?
A. Yeah.
Q. So, the ticket is actually voided?
A. Yes.
Q. Okay, it never goes to Justice Court or anything like that?
A. No.
Q. Okay. And you[ — ]
A. It goes to Justice Court, I turn it in, but I turn it in as I voided the ticket.
Q. Okay. And you count those on your activity sheet?
A. Yeah.
*213 Q. Okay. Have you ever done that with any other charge other than a seat belt violation? I mean[.]
A. No.
Q. Nothing other than a seat belt, so we know no inspection stickers or what about insurance?
A. No.
[[Image here]]
Q. Okay. But, it’s only the seat belt violation that you — that you charge or actually] not charge them with that[;] you mark it on the citation then void it, right?
A. Yes.
Q. Okay. And you said you’ve done that probably about 25 times.
A. Probably.
Following the interview, Ray wrote the following statement and gave it to Sergeant Mansell:
During this interview!,] I have admitted to the writing of 20-25 tickets that were seat belt tickets and some of the tickets that I issued were not valid tickets (seat belt tickets). These tickets were turned into [sic] the Justice Court and turned in along with my weekly reports. All seat belt tickets were voided when they were turned into [sic] the Justice Court.
¶ 48. In the next statement that Ray gave to Sergeant Mansell, in interview form, Ray stated the following:
Q. Alright. The — the first time that I interviewed you — can I just call you Sammy?
A. Yeah.
Q. Alright. The first time I conducted an interview with you was on, I believe October, I think it was the 22nd if I’m not mistaken, 26th, October 26th and during that interview we discussed the citations that you had written and particularly four that you had written where you made a traffic stop and for whatever violation and then at the end of the traffic stop you had added a — a ticket even though that violation didn’t occur. And I believe the names were Sandra Carpenter, Josh Ulmer, William Thomas, and Kasey [sic] Patterson. Do you recall me showing you those citations during the last interview?
A. Yes.
Q. Okay, and after we went over those citations, I believe I asked you about how many times that you had done that in addition to the ones that we discussed and you said roughly 20 to 25 times. Do you recall saying that?
A. Yes.
Q. Okay. Would that be a fair estimate of the number of times that you — that you did that?
A. Yes.
Q. Okay. And what — what were those violations for? Where the tickets were made up or just added ticket on to someone — using someone’s information just writing another ticket even though the violation didn’t occur?
A. Once I had that person stopped possibly for speeding or whatever violation may [have] occurred, I wrote a seat belt ticket for that also.
Q. Okay. So all of them were seat belt violations to the best that you can remember?
AYeah.
Q. Okay. Do you remember these two citations right here, that was Josh Ulmer, that was one for a seat belt violation and then a speeding?
A.Yes.
Q. Do you remember that citation?
A.Somewhat.
*214 Q. Okay. And do you remember that one being one that you wrote a seat belt violation to or the speeding violation?
A. Yeah, possibly.
Q. And when — when was the first time that — that you recall writing the first citations?
A. A month.
Q. A month ago?
A. No, no, I mean like a certain month or [ — ]
Q. I mean, how long do you think that this has been going on is what I’m — I’m asking?
A. Over my career? I’d say within the last couple of months.
Q. Okay. And what — what brought that on. I mean what — what transpired [sic] you to just add extra tickets?
A. I was just trying to get my numbers up.
[[Image here]]
Q. Well, let me ask you this, who — who do you remember stopping and — for a violation and then writing them a seat belt violation when they had it on or you just went back to the car and just wrote one just — just to write it? Do you recall anybody?
A. No really, I — I just know that I’ve done it that many times, ypu know, about that many times.
[[Image here]]
A. What’s going to happen next?
Q. I don’t — this is the only thing I do — I do right here just the interview. But just for — just for the ' record that and you — you tell me if I am right or wrong but according to the last interview that we did, it was 20 to 25 tickets that you — that you said that, you know without a shadow of a doubt that you wrote where the violation was not there. You just wrote an additional seat belt violation to the actual violation on that stop to increase your activity on your ticket control sheet?
A. Yeah.
Following the above interview, Ray wrote the following statement and gave it to Sergeant Mansell: “During the time I have been employed with the MDPS, I have written 20-25 tickets that may or may not be factual tickets. These tickets were seat belt violations. This was done to increase my ticket activity.”
¶ 49. As to the charges brought against Ray, the Performance Review Board unanimously determined: “Group Three Offense (Four Counts) — (falsification of records, such as, but not limited to, vouchers reports, time records, leave records, employment applications or other official state documents) is founded.” On appeal to the EAB, the hearing officer found the Department had sufficient grounds for terminating Ray. In arriving at this ultimate finding, the hearing officer also found:
One of the methods of evaluating highway patrol officers is by the number of tickets they write.
When Ray wrote the tickets at issue he would write “void” on the motorist copy and the court copy; he would then turn in the clean copy of the tickets to the master sergeant and shred the fourth copy.
During the investigation into Ray’s activities, he admitted to Internal Affairs Investigator, Creed Mansell, that on 20-25 occasions he had written tickets for seat belt violations which were not valid.
[[Image here]]
After his pre-termination hearing before the Performance Review Board of the Mississippi Highway Safety Patrol, “the board determined that four counts of Group Three Offense (falsification of record[s], such as but not limited to, *215 vouchers, reports, time records, leave records. Employment applications[;] or other official state documents) is founded.”
On appeal, to the full EAB, the full EAB found:
Pursuant to Mississippi Code Annotated section 63-9-21, a ticket written by a Mississippi highway patrol officer is an official state documents in which the officer swears that the information therein is correct. The facts of this case clearly show that Ray issued tickets to motorists for violations that did not exist or that he was “unsure” existed, namely seat belt violations. Ray argued that these were “warning” or “voided” tickets and that he did not try to hide writing the tickets. However, the fact that he wrote the tickets, whether it be one, four or twenty, and was either unsure of the violation or made up the violation is an act of falsifying information on an official state document. That he voided the tickets and allegedly did not try to hide his actions is irrelevant as the act of knowingly writing a false ticket was committed. Further, Ray admitted that he wrote the tickets to increase the number of tickets he was credited with writing. These acts by Ray clearly constitute a falsification of an official state document[,] which is a Group Three Offense, subject to discipline by termination.
¶ 50. Based on the plethora of evidence that Ray turned in false tickets for four individuals who were identified at the beginning of the hearing, it is not clear to me why the majority finds that neither the hearing officer nor the full EAB found that Ray falsified any of the tickets he issued to those four individuals, namely: Patterson, Ulmer, Thomas, and Carpenter. I assume the majority bases its finding on its narrow reading of those orders. Regardless, in my judgment, the majority’s finding is not borne out by this record. It is clear that Ray admitted to writing twenty to twenty-five fraudulent tickets for seat belt violations that did not occur. He also admitted that he had not written, in his entire career, more than that number for seat belt violations that had not occurred.
¶ 51. The evidence is uncontradicted that Ray was the officer who wrote and turned in seat-belt-violation tickets for Patterson, Thomas, and Carpenter. He also wrote and turned in a speeding ticket for Ulmer that he did not give to Ulmer. The evidence is also uncontradicted that Patterson, Thomas, and Carpenter were not given a citation for a seat belt violation by Ray when he stopped them. Also, Ul-mer stated that Ray did not give him a ticket for speeding and never mentioned speeding to him; yet Ray wrote and turned in a speeding ticket for Ulmer. The tickets for the seat belt violations that Ray wrote for Patterson, Thomas, and Carpenter had to be included in the twenty to twenty-five tickets for seat belt violations that he wrote, as the evidence is clear that Ray wrote only twenty to twenty-five fraudulent tickets for seat belt violations in his entire career. And since both the hearing officer and the full EAB found that Ray wrote false tickets for seat beat violations, how can it be said that the hearing officer and full EAB did not find that Ray falsified the tickets for these four individuals? I should note the majority states that neither the hearing officer nor the full EAB found that the tickets Ray gave to Patterson, Thomas, Carpenter, and Ulmer were falsified. If the majority’s finding and holding are based on the lack of findings with respect to falsification of tickets given to the four individuals, then the majority has failed to grasp the breadth of the charges leveled against Ray. The falsification involved tickets that were written by Ray and turned in to his superiors for violations that never occurred, not the tickets that were written *216 for real violations and given to the violators.
¶ 52. Finally, in my judgment, while the orders of the hearing officer and the full EAB do not make a specific finding that Ray wrote fraudulent tickets for any named individual, it is clear that the findings made in the orders refer to Ray’s ticket-writing conduct with respect to Patterson, Thomas, Ulmer and Carpenter, as well as to his conduct generally with respect to fraudulent ticket writing involving other unnamed individuals. To find that the hearing officer and the full EAB did not find that, on four occasions, Ray falsified an official state document, a traffic ticket, by turning in false tickets for seat belt violations for Patterson, Thomas, Carpenter and Ulmer is to ignore the undisputed facts in this record and to read the orders in a vacuum. I cannot do so. Therefore, I dissent. I would affirm the judgment of the Hinds County Circuit Court affirming the order of the full EAB terminating Ray from the Department.
GRIFFIS, P.J., AND MAXWELL, J., JOIN THIS OPINION.

. This appeal involves the charge of falsification of records, or other official state documents. The insubordination charge was dismissed by the hearing officer.